UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Cory J. L., | No. 22-cv-1953 (KMM/DLM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Kilolo Kijakazi,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Cory J. L. seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for benefits. This matter is before the Court on Plaintiff's Brief requesting reversal and remand for further administrative proceedings (Doc. 17) and Defendant's Motion for Summary Judgment (Docs. 19–20). The case has been referred to the undersigned magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons below, the Court recommends that Plaintiff's request be denied, and Defendant's motion for summary judgment be granted.

## BACKGROUND

On February 27, 2020, Plaintiff applied for Disability Insurance Benefits ("DIB"), alleging he had been disabled since January 1, 2017. (Tr.[1] at 14.) The Social Security Administration ("SSA") denied his claim initially and upon reconsideration. (*Id.*) Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ held a hearing on the matter on July 14, 2021. (*Id.*) Counsel represented Plaintiff at the hearing, and Plaintiff testified on his own behalf. (*Id.*) An impartial vocational expert also testified at the hearing, as did Plaintiff's spouse. (*Id.*)

On August 5, 2021, the Commissioner sent a notice of an unfavorable decision to Plaintiff. (Tr. at 11–29.) The ALJ recognized that Plaintiff suffered from several severe impairments, including diabetes mellitus, peripheral neuropathy, ulnar neuropathy, carpal tunnel syndrome, chronic obstructive pulmonary disease ("COPD"), mild cerebral atrophy, depression, anxiety, attention-deficit hyperactivity disorder ("ADHD"), and posttraumatic stress disorder ("PTSD"). (Tr. at 16.)

Despite Plaintiff's mental and physical impairments, the ALJ found that he is not disabled. (Tr. at 27–29.) The ALJ determined that Plaintiff retained the residual functional

---

[1] The Commissioner filed the consecutively paginated transcript of the administrative record on December 16, 2022. (Doc. 16.) For ease of reference, citations to the transcript will identify the page number listed on the lower right corner of the cited document rather than docket page number or exhibit number.

capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b)[2] with these additional limitations:

> never climb ladders, ropes, or scaffolds; can frequently reach, handle, and finger; can tolerate occasional exposure to atmospheric conditions or pulmonary irritants such as fumes, odors, dust, gases, and poor ventilation; can tolerate no exposure to hazards such as unprotected heights and moving mechanical machinery; can understand, remember, and carry out simple, routine tasks in a routine work setting involving no more than occasional workplace changes; can never perform rapid pace assembly line work; can tolerate occasional superficial interaction with the general public; and can tolerate occasional interaction with supervisors and coworkers but not in a cooperative or team effort.

(Tr. at 21.) The ALJ credited the testimony of the vocational expert that Plaintiff could not perform his past relevant work as a drywall installer, listed in the Dictionary of Occupational Titles ("DOT") as No. 842.361-030; machine operator, DOT No. 619.685-062; infantryman, DOT No. 378.684-014; or mechanic, DOT No. 620.281-038. (Tr. at 27.) Nonetheless, the ALJ also credited the vocational expert's testimony that there were other jobs that exist in significant numbers in the national economy that Plaintiff could perform, such as routing clerk, DOT No. 222.687-022; mail sorter, DOT No. 209.687-026; and office helper, DOT No. 239.567-010. (Tr. at 28.)

Before this Court, Plaintiff asserts that the ALJ failed to properly evaluate his mental symptoms and limitations when constructing his RFC. More specifically, Plaintiff argues

---

[2] By regulation, light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Even if the "weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

3

that his concentration, persistence, and pace deficits were not properly accounted for in his RFC, and further asserts that the ALJ erred by not adopting all the workplace limitations suggested by his therapist and a consultative examiner. These errors, according to Plaintiff, resulted in a faulty RFC which led to an inaccurate finding that jobs existed in the national economy which he could perform.

## ANALYSIS

This Court reviews an ALJ's denial-of-benefits decision to determine whether it is supported by substantial evidence in the record as a whole, and whether the decision is infected by legal error. 42 U.S.C. § 405(g); *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also Nash v. Comm'r, Soc. Sec. Admin*, 907 F.3d 1086, 1089 (8th Cir. 2018) (characterizing "substantial evidence" as "less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions"). Courts reviewing ALJ decisions must look to the entire administrative record to determine whether it contains sufficient evidence to support the ALJ's conclusion. *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). If substantial evidence supports the ALJ's decision, the Court will not reverse, even if substantial evidence also supports a contrary outcome. *Nash*, 907 F.3d at 1089. But if an ALJ used erroneous legal standards, or if they incorrectly applied the law, those may be reversible legal errors. *Joel M. B. v. Kijakazi*, No. 21-cv-1660 (PAM/ECW), 2022 WL 1785224, at *2 (D. Minn. June 1, 2022) (citing *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011));

4

*Michael B. v. Kijakazi*, No. 21-cv-1043 (NEB/LIB), 2022 WL 4463901, at *1 (D. Minn. Sept. 26, 2022).

I.  **Substantial evidence in the record supports the ALJ's RFC determination because he properly accounted for Plaintiff's mental symptoms and limitations.**

Plaintiff asserts that the ALJ discounted the breadth of his mental symptoms and limitations in the evaluative process used for DIB claims.[3] He specifically argues that subjective and medical evidence establishes greater limitations in concentration, persistence, and pace than the ALJ found, and these limitations meet his burden to show he is disabled. As support for his position, Plaintiff directs the Court to his own reports of his mental symptoms and limitations, state agency administrative findings, the prior administrative medical finding of consultative examiner, Dr. Sherie Carlson, and the medical opinion of Plaintiff's therapist, Ms. Susan Thompson. (Tr. at 67, 70–71, 91–92, 699, 701, 702–03, 750, 751, 752, 753.)

The Commissioner argues that the ALJ considered the record as a whole, properly assessed Plaintiff's mental limitations in light of his RFC, and accounted for limitations

---

[3] Step one of this process involves determining whether a claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If not, the ALJ must next decide, at step two, whether the claimant's impairments are severe, and of a duration of least 12 continuous months. *Id.* § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairments are severe enough to equal a listed impairment under appendix 1 to subpart P of part 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is considered disabled without further inquiry. If not, the ALJ must determine the claimant's RFC, and determine, at step four, whether the claimant can still do their past relevant work given their limitations. *Id.* § 404.1520(a)(4)(iv). Finally, if the ALJ concludes a claimant cannot perform their prior work, step five requires the ALJ to determine whether they can do other work considering their RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v).

5

that the record supports. She asserts that although the ALJ considered Plaintiff's history of PTSD, ADHD, depression, and anxiety, objective medical evidence failed to support Plaintiff's allegations of significant deficits in concentration, persistence, and pace. The Commissioner also argues that the ALJ properly rejected some of the limitations suggested by Dr. Carlson and Ms. Thompson because their assessments were inconsistent with other record evidence.

It is Plaintiff's burden to establish that his RFC should have included greater limitations for his mental impairments. *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing 20 C.F.R. §§ 404.1520(a), (e), (f); 404.1545–46; 404.1560–61; *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). The question before the Court is whether a reasonable mind could accept that no such limitations are necessary on this record, as the ALJ found. *Biestek*, 139 S. Ct. at 1154. In considering this question, the Court does not substitute its own judgment for that of the ALJ by reweighing the evidence; instead, it must consider evidence that supports and detracts from the ALJ's decision, and affirm the ALJ's decision where "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015) (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)).

The following summary of the record demonstrates that a reasonable mind could accept that Plaintiff's RFC did not require greater limitations for his mental impairments than what the ALJ imposed. Plaintiff was referred for a mental status consultative examination by Dr. Carlson on September 24, 2020. (Tr. at 699–703.) During the

examination, Plaintiff reported that he "[was] fatigued, easily angered, and [had] trouble remembering directions . . . and [had] trouble remembering what his wife [told] him to do during the day." (Tr. at 699.) He reported that he "will panic at times . . . that he is easily agitated and has trouble getting along with others at times . . . [and] has a hard time concentrating on things he is not interested in." (*Id.*) Plaintiff also reported that he was in the Army National Guard where he deployed twice for a total of 39 months. (*Id.*) When he returned from his deployments he had "triggers," but worked for a "company for [seven] years," until he left his job after an argument with another employee. (*Id.*) Plaintiff then went back to dry wall work and "decided to go to college." (*Id.*) He attended college for a year and half, but he left school to take care of his wife when she became ill. (*Id.*) During the examination, Plaintiff reported that on a typical day he "eats breakfast and takes the dog out then drives his wife to work . . . and will pick her up at the end of the day." (Tr. at 700.) Plaintiff reported that while his wife was at work he would "[come] back to the house and . . . do household chores such as dishes, vacuuming, and other cleaning as well as the laundry." (*Id.*) He also reported making "his own simple meals for lunch and breakfast," and making dinner with his wife. (*Id.*) Plaintiff told Dr. Carlson that while he "does his own daily grooming . . . his wife [reminds] him to take medications at times . . . and does write down instructions for him . . . if she wants something specific done as he will not remember to do it on his own." (*Id.*)

During this examination, Dr. Carlson observed that Plaintiff's "attitude [was] cooperative and he tries very hard on tasks . . . but he did become irritated . . . when he was reminded repeatedly of instructions and to wait until instructions were given before starting

a task." (*Id.*) She observed that he was "distractable," but "did not become agitated or frustrated during the assessment." (Tr. at 701.) While Plaintiff occasionally became irritated, Dr. Carlson described his overall demeanor as "euthymic."[4] (*Id.*) He "was able to complete all subtests on the WAIS-IV [Wechsler Adult Intelligence Scale-Fourth Edition] and WMS-IV [Wechsler Memory Scale-Fourth Edition]." (Tr. at 702.) He obtained an IQ score in the "low average range," but "his profile of scores indicate[d] that his long term memory for information [was] exceptional and in the high average range." (*Id.*) Plaintiff received "standard scores in the areas of auditory memory, visual memory, visual working memory, delayed memory and immediate memory." (*Id.*)

Based on her observations during the examination, Dr. Carlson found that Plaintiff "demonstrate[d] severe difficulty with concentration and attention for the examination today and [needed] directions repeated." (Tr. at 703.) Dr. Carlson then said that Plaintiff "does appear to be able to carry out very simple tasks with supervision," although "gainful and competitive employment is not likely." (*Id.*)

Moving next to examination and opinion evidence from Susan Thompson, she observed during a March 21, 2019 appointment that Plaintiff's affect was congruent with his mood, and he was euthymic with no unusual thought content. (Tr. 427.) She also noted that Plaintiff "[h]as strong coping and problem solving skills." (*Id.*) Ms. Thompson made the same observations on December 5, 2018, (Tr. at 456) and December 8, 2020, (Tr. at

---

[4] A euthymic mood is consistent with a person experiencing a lucid or pleasant state of mind. *Euthymic*, Collins English Dictionary (2023), *available at* https://www.collinsdictionary.com/us/dictionary/english/euthymic (last visited Dec. 12, 2023).

8

890). On March 18, 2021, Ms. Thompson observed that "[Plaintiff's] scores on the PCL-5 [PTSD Checklist for DSM-5]/BDI-2 [Beck Depression Inventory-Second Edition]/GAD-7 [General Anxiety Disorder-7] were all better today than previous sessions." (Tr. at 826.) Again, she noted that his affect was congruent with his mood, he had no unusual thought content, and "[had] strong coping and problem solving skills." (*Id.*) On April 8, 2021, Ms. Thompson wrote a letter and authored a medical source statement on Plaintiff's behalf. (Tr. at 750.) Ms. Thompson stated in her letter that although Plaintiff "does not handle stress well and can easily become distracted or have anger outbursts[,]" he is able to function in "low-key environments where he works alone or with few people, and can control his schedule." (*Id.*) In a questionnaire about Plaintiff's limitations, Ms. Thompson reported that Plaintiff had no or only mild limitations in carrying out very short and simple instructions; carrying out detailed instructions; sustaining an ordinary routine without special supervision; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; maintaining socially-appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; and having the ability to set realistic goals or make plans independently of others. (Tr. at 752.) She found that Plaintiff had mild to moderate limitations in understanding and remembering very short and simple instructions; and in understanding and carrying out detailed instructions. (*Id.*) She also found Plaintiff had moderate limitations in remembering locations and work-like procedures; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting

9

behavioral extremes; and responding appropriately to changes in the work setting. (*Id*.) Finally, Ms. Thompson found Plaintiff had marked to extreme limitations in maintaining attention and concentration for more than two-hour segments; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with, or proximity to, others without being distracted by them; completing a normal work day and work week without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods; traveling in unfamiliar places or using public transportation; and tolerating normal levels of stress. (*Id*.) She explained that he might need to take off from work "about three days per month," because of impairments or necessary medical treatment. (Tr. at 753.)

Turning to other evidence in the record beyond that of Dr. Carlson and Ms. Thompson, a physician assessing Plaintiff during a January 3, 2019 gastroenterology appointment noted that "[h]is behavior [was] normal." (Tr. at 622.) On August 8, 2019, a neurologist observed that Plaintiff's "[a]ttention span, fund of knowledge, speech and language functions are normal." (Tr. at 399.) In Plaintiff's August 13, 2019 Veterans Administration compensation and pension examination, the examiner observed that "[Plaintiff's] IQ [was] estimated as within the average range . . . [his] memory, focus, attention, and cognition were within expected limits . . . [his] affect was euthymic [and his]

mood was congruent."[5] (Tr. at 387.) At a medical appointment on October 1, 2019, the provider observed that Plaintiff was "[o]riented in time, place, and person[,]" and his "[a]ttention span, fund of knowledge, speech, and language functions are normal." (Tr. at 344.) A group therapy progress note from a visit with a Clinical Psychologist on November 21, 2019, described Plaintiff as "engaged during discussion, at times slightly tangential, but redirectable. He provides feedback/encouragement to other members sharing their current challenges." (Tr. at 341.) At a February 21, 2020 appointment, Plaintiff's neurologist observed that he was "alert, cooperative," and his "attention, concentration, fund of knowledge, memory and language functions" were "adequate for the encounter." (Tr. at 337.)

Turning next to the video-conference hearing before the ALJ on July 14, 2021, Plaintiff testified that he had been going to school for business management for eight hours a week "[f]ull credits . . . five courses." (Tr. at 47.) While Plaintiff told the ALJ he felt "a little bit out of place, being my age . . . I was a little older than the 20- and the 18-year-olds that were there," he also told the ALJ he "had no problem trying to learn." (*Id*.) Plaintiff reported that he completed three semesters of college before he left to care for his ailing wife. (Tr. at 53.) Plaintiff testified that although he struggled with his ADHD and received

---

[5] Just two days after this appointment, Ms. Thompson observed that Plaintiff had a euthymic affect, no unusual thought content, and his judgment was fair. (Tr. at 352.) She also noted that Plaintiff "[h]as strong coping and problem solving skills." (Tr. at 353.)

11

accommodations, he rarely leveraged those accommodations and he earned average to above average grades, "Cs and Bs."[6] (*Id.*)

Plaintiff's spouse also testified at the hearing, reporting to the ALJ that Plaintiff struggles with concentration and attention, and he needs reminders for appointments, taking his medication, or taking out the trash. (Tr. at 55.) Plaintiff's spouse also reported that Plaintiff has a "hard time" with short-term memory, but "he does very well" with long-term memory. (Tr. at 56.) She testified that Plaintiff does not like people to startle him and can become irritable while watching television or when he is among a large group of people. (Tr. at 57.) She also reported that Plaintiff can become anxious and sometimes has trouble sleeping. (*Id.*)

In terms of evidence concerning Plaintiff's mental limitations, the ALJ explicitly considered Plaintiff's history of PTSD and participation in group therapy (Tr. at 23, 339–41, 350), and noted Plaintiff's ADHD, depression, and anxiety (Tr. 23, 358, 491, 702, 883). Yet the ALJ found that although examinations showed some findings, they did not prove disabling limitations. (Tr. at 22.) The ALJ also recognized Plaintiff's anxiety (Tr. at 24, 622), and acknowledged that he was "tangential at times," but also able to be redirected (Tr. at 24, 340). The ALJ also pointed to several examinations (some cited above) which showed that Plaintiff was cooperative, alert, and fully oriented with adequate attention, concentration, eye contact, speech, mood, thoughts, fund of knowledge, memory, and

---

[6] The ALJ's decision states that Plaintiff earned Cs and Ds in college (Tr. at 22), but according to the telephonic hearing transcript, Plaintiff reported to the ALJ that he earned Cs and Bs (Tr. at 53).

12

language. (Tr. 24, 337, 344, 352–53, 387, 399, 417, 427, 456, 826, 890.) After considering all the evidence in the record—including Plaintiff's daily activities; the nature of his symptoms; precipitating and aggravating factors; the medications and any side effects; other treatment followed and measures used to relieve symptoms; and any other factors concerning functional limitations and restrictions—the ALJ found that the objective medical evidence reflected that the intensity, persistence, and limiting effects of his mental impairments are not as limiting as Plaintiff alleged. (Tr. at 22.)

Specifically as it relates to Dr. Carlson and Ms. Thompson, the ALJ determined that the breadth of suggested limitations was inconsistent with the record as a whole which showed that Plaintiff "demonstrated adequate attention, concentration, focus, cognition, memory, fund of knowledge, speech and language . . . [and] had logical and linear thoughts, fair judgment and fairly motivated insight . . . [and] was also alert and oriented." (Tr. at 26-27 (citing Tr. at 337, 341, 344, 352, 353, 387, 399, 427, 456, 622, 826, 890).) But despite finding Dr. Carlson's and Ms. Thompson's determinations unpersuasive, the ALJ accounted for limitations suggested by each that were consistent with other objective medical evidence when fashioning his RFC. For example, Dr. Carlson stated Plaintiff could carry out very simple work tasks, but he would struggle to tolerate workplace stress and had "capacity for brief and superficial contact with others[.]" (Tr. at 703.) Similarly, Ms. Thompson stated that Plaintiff did not handle stress well and was easily distracted and that he "functions best in low-key environments where he works alone or with few people[.]" (Tr. at 750.) Accordingly, the ALJ limited Plaintiff to "simple, routine tasks in a routine work setting with only occasional changes and no rapid pace assembly line work," with

13

only "occasional superficial interaction with the general public," and "occasional interaction with supervisors and coworkers but not in a cooperative or team effort." (Tr. at 21.)

Based on its review of the record and the ALJ's determination, the Court finds that the ALJ provided the required explanation for discounting certain aspects of the medical findings and opinions based on supporting or conflicting evidence in the record. Plaintiff argues that the record supports, and is in fact consistent with, Dr. Carlson's and Ms. Thompson's assessments, such that the ALJ should not have discounted those assessments whatsoever in fashioning Plaintiff's RFC. In support of this argument, Plaintiff directs the Court to evidence of his limitations with concentration and attention, irritability and aggressive or angry behavior, and exaggerated startled response, but many of Plaintiff's citations represent his self-reported symptoms and treatment goals that Plaintiff does not show are corroborated by objective medical observations elsewhere in the record. (Doc. 17 at 12–13, n.8.) Thus, although Plaintiff can point to several citations in the record to support his position, ultimately a reasonable mind could look to other places in the record to support the ALJ's determination that Plaintiff demonstrated "adequate attention, concentration, focus, cognition, memory, fund of knowledge, speech and language . . . had logical and linear thoughts, fair judgment and fairly motivated insight [and was] alert and oriented." (Tr. at 25, 26, 27 (citing Tr. at 337, 341, 344, 352, 353, 387, 399, 427, 456, 622, 826, 890.))

Where, as here, substantial evidence on the record supports the ALJ's RFC determination and the decision to discount Dr. Carlson's and Ms. Thompson's determinations, the Court "may not reverse that decision," even if it "would have reached

14

a different conclusion than the Commissioner or because substantial evidence supports a contrary conclusion." *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) (quoting *Igo v. Calvin*, 839 F.3d 724, 728 (8th Cir. 2016)) (cleaned up). On this record, the Court finds that substantial evidence supports the ALJ's determination that Dr. Carlson's and Ms. Thompson's conclusions were unpersuasive and supports the ALJ's RFC determination—including its limitations for Plaintiff's mental impairments.

## II.   Substantial evidence supports the ALJ's step-five finding that Plaintiff was not disabled because he could perform other work.

Plaintiff also argues that the vocational expert's testimony does not constitute substantial evidence because the hypothetical question the ALJ posed to the vocational expert did not include all of Plaintiff's limitations. The Commissioner argues that Plaintiff did not meet his burden of proving any additional limitations and therefore the vocational expert's testimony in response to the ALJ's hypothetical constitutes substantial evidence to support the ALJ's finding that Plaintiff was not disabled because he could perform other work existing in significant numbers in the nation's economy.

A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments. *Hulsey v. Astrue*, 622, F.3d 917, 922 (8th Cir. 2010) (citing *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005)). During the video-conference hearing, the ALJ consulted the vocational expert regarding the effect of Plaintiff's limitations. (Tr. 41–43.) In response to a hypothetical question addressing Plaintiff's age, education, work experience, and RFC, the vocational expert testified that such an individual could not perform Plaintiff's past work but could

perform other work existing in significant numbers in the national economy, including a routing clerk, DOT No. 222.687-022; mail sorter, DOT No. 209.687-026; and office helper, DOT No. 239.567-010. (Tr. at 28, 41–43.) Because the ALJ's hypothetical question accurately reflected Plaintiff's limitations based on his impairments as determined by the ALJ, the vocational expert's testimony constituted substantial evidence supporting the ALJ's finding that Plaintiff was not disabled. *Hulsey*, 622, F.3d at 922 (citing *Grissom*, 416 F.3d at 837.) Based on the vocational expert's testimony, the ALJ properly found that Plaintiff was not disabled at step five because he could perform other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v) ("If you can make an adjustment to other work, we will find that you are not disabled.").

## RECOMMENDATION

Based on the above, and on all the files, records, and proceedings, **IT IS RECOMMENDED** that:

1. Plaintiff Cory J. L.'s Brief (Doc. 17) be **DENIED**; and

2. Defendant Kilolo Kijakazi's Motion for Summary Judgment (Doc. 19) be **GRANTED.**

DATED: December 14, 2023         *s/Douglas L. Micko*
                                  DOUGLAS L. MICKO
                                  United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "[a] party may file and serve specific written

objections to a magistrate judge's proposed findings and recommendations within 14 days after being served with a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).